J-S24033-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: W.S., AN INCAPACITATED PERSON | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.S. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 511 EDA 2022 |

Appeal from the Decree Entered January 19, 2022
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  2021-X4874

BEFORE:  PANELLA, P.J., LAZARUS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED SEPTEMBER 15, 2022**

W.S. appeals from the decree entered in the Court of Common Pleas of Montgomery County Orphans' Court (orphans' court) adjudicating him an incapacitated person and appointing Kalpana Doshi, a Principal at Adjustments, Inc. (Ms. Doshi), Plenary Permanent Gaudian of his Estate and Person.  W.S. contends that the orphans' court abused its discretion in adjudicating him incapacitated and in need of a guardian where the evidence shows that he is capable of independent living.  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

**I.**

**A.**

The relevant facts and procedural history of this case are as follows. W.S. is a 75-year old single male with no known close relatives. On November 18, 2021, the Montgomery County Office of Senior Services (the Agency) filed a Petition for Adjudication of Incapacity and Appointment of Plenary Guardian pursuant to Section 5511 of the Probate, Estates and Fiduciaries (PEF) Code.[1] The orphans' court appointed counsel to represent W.S., and neuropsychologist George Ledakis, Ph.D. to perform an independent medical examination. Dr. Kenneth Carroll, an expert in geriatric assessment who has performed over 20,000 psychological examinations (including 2000 specifically to help determine capacity) had previously evaluated W.S. on three occasions in 2021 while W.S. resided in a nursing and rehabilitation center, where he continued to reside at the time of the incapacity hearing.

**B.**

At the January 19, 2022 hearing, caseworker Allison Kifer testified that the Agency had received reports of self-neglect concerning W.S. in September and December 2020. W.S. was living independently in an apartment, but was

---

[1] **See** 20 Pa.C.S. §§ 5501-5555. Section 5511 provides that a court, "upon petition and hearing and upon the presentation of clear and convincing evidence, may find a person domiciled in the Commonwealth to be incapacitated and appoint a guardian or guardians of his person or estate." **Id.** at 5511(a).

unable to provide for his daily needs which resulted in falls, numerous hospitalizations and 911 calls made on his behalf. Ms. Kifer described a pattern of "multiple hospital stays, multiple rehab stays, usually leaving against medical advice [(AMA)] from either the hospital or the rehab within 24 hours of being admitted, and then re-presenting to the hospital for similar issues within a day or two [because of] falls, mobility concerns, shortness of breath, [and] wounds." (N.T. Hearing, 1/19/22, at 50-51). Although Ms. Kifer initially arranged homecare services for W.S. and assistance with his rent, food and medication, he again deteriorated and experienced falls, hospitalization and rehabilitation services.

Ms. Kifer recounted that W.S. was discharged AMA from a rehabilitation facility in September 2021 and that placing him with a guardian was very difficult because of his limited financial means and lack of cooperativeness. (*See id.* at 51, 54). Review of W.S's financial records showed $5,000 in cash/investments and a Social Security income of approximately $1,000 per month. Ms. Kifer opined that, to her knowledge, no guardian would accept an appointment without assurance that W.S. is in a structured 24-hours/day care setting, and she advised that W.S.'s former power of attorney resigned because of his lack of cooperation.

Dr. Carroll testified that he evaluated W.S. in February, March and October 2021. At their first meeting, W.S. was unable to walk because of a swollen foot. Dr. Carroll observed that W.S. is "an intelligent man, very smart

guy," but that he has issues with abstract reasoning and executive functioning that can be debilitating. (*Id.* at 14). W.S. engages in "storytelling [that is] just not very believable.". For example, "one time he said he had 24 million dollars, and the next time it went up to 26 million dollars, and the third time it dropped to about 400,000." (*Id.* at 17). Dr. Carroll diagnosed W.S. with major neurocognitive disorder (dementia) and assessed W.S.'s insight into his condition as "very, very poor. He doesn't really understand how serious his condition is, and he can't anticipate problems, so what's going to happen when we leave [this hearing] he doesn't even think about things like that." (*Id.* at 20). Dr. Carroll opined that W.S.'s ability to process information is impaired to an extent he can no longer make and communicate safe and appropriate decisions for the benefit of his health and welfare as to both his medical and financial needs. (*See id.* at 21).

As to any cognitive differences W.S. demonstrated over the course of the evaluations, Dr. Carroll testified that overall, there was "not much difference among the three testings." (*Id.* at 13). Regarding W.S.'s potential marginal improvements, Dr. Carroll explained that although W.S. showed some gains in a clock drawing test, this finding did not conflict with his ultimate diagnosis of dementia because W.S. performed "better than the previous time but not great. And the difficulty in assessing his insight is not a good thing . . . [because of] the difficulty in separating [what he says as] fact from fiction." (*Id.* at 23). For instance, W.S. "told me he left the nursing home

- 4 -

because he was bored . . . and managed really well and was living okay for a year." (*Id.*). When Dr. Carroll challenged W.S. by clarifying that W.S. was in a nursing home during the relevant time period, W.S. "changed [his response] but he believes he is capable of independent living," and is eager to return home, without recognizing any pattern in his history. (*Id.*).

Dr. Ledakis testified that he administered an extensive neuropsychological evaluation of W.S. composed of several tests and that he reviewed W.S.'s medical records and spoke with nursing staff. (*See id*. at 33-34). Dr. Ledakis opined that any improvements Dr. Carroll observed with respect to W.S.'s ability speaks to "how sick medically he was in those earlier evaluations" and flatulate "depending how sick he is." (*Id.* at 34). During W.S.'s hospitalizations, he was diagnosed with a bone and blood infection and toxic encephalopathy (delirium), which likely caused changes in his mental status. (*See id.* at 35).

Dr. Ledakis further testified that W.S. is medically fragile and the acute chronic conditions he suffers have only stabilized because of the treatment he has received. Dr. Ledakis opined that W.S. is suffering from vascular dementia because he has multiple vascular heart conditions including heart disease, congestive heart failure and hypertension. (*See. id*. at 35-38). Dr. Ledakis stated his belief that if W.S. were released to his home as requested, the outcome would not be positive and he would be "right back to where we are now [] maybe a hospitalization for addressing acute issues [or] in some

skilled nursing facility to kind of rehab back to baseline. It's the same pattern that we've seen over the past year." (***Id.*** at 39).

Ms. Doshi testified briefly at the hearing and explained that if W.S. maintained trading accounts, this could interfere with his eligibility for government benefits because Medicaid requires liquidation of assets to remain in a nursing home facility. (***See id.*** at 58-59).

W.S. did not testify, but he did make a statement to the orphans' court indicating that he earned $178,062 in trading investments in the last 19 months and described his trading record as "spectacular." (***Id.*** at 60). W.S. planned to establish a retail business within the next three months and was actively looking to purchase property for this purpose. Regarding his health, W.S. averred that although he had medical issues in 2009, he now has "no problems whatsoever" and is medically sound without need of a guardian. (***Id.*** at 61). W.S. also denied any problems with maintaining adequate food, electricity and medical care, and he described the infection in his leg as "ancient history." (***Id.*** at 62).

At the conclusion of the hearing, the orphans' court adjudicated W.S. incapacitated and appointed Ms. Doshi as plenary guardian of his estate and person. In doing so, the court found that W.S. "has neurocognitive impairment, a condition that totally impairs [his] capacity to receive and evaluate information effectively and to make and communicate decisions concerning management of [his] financial affairs or meet essential

requirements of [his] physical health and safety." (***Id.*** at 67). The orphans' court also noted its credibility determination against W.S. regarding his description of his mental state and ability to live independently, and found the testimony of Drs. Carroll and Ledakis and Ms. Kifer far more believable. (***See*** Orphans' Court Opinion, 4/12/22, at 10). W.S. timely appealed and he and the orphans' court complied with Rule 1925. ***See*** Pa.R.A.P. 1925(a)-(b).[2]

## II.

## A.

W.S. challenges the orphans' court appointment of a plenary guardian of his estate and person, primarily by disputing the court's credibility determinations in favor of the Agency. W.S. points to Dr. Carroll's testimony regarding the improvements he exhibited, including Dr. Carroll's observation that W.S. was "alert, clear, coherent, cooperative [and] well-orientated to time and place" during the final visit. (W.S.'s Brief, at 20). According to W.S., Dr. Carroll baselessly concluded that he is a "pathological liar" without independently confirming the veracity of the information W.S. provided, and that the findings of Dr. Ledakis are in conflict with those of Dr. Carroll with respect to his honesty. (***Id.*** at 23-24). W.S. also contends the orphans' court

---

[2] "A person is presumed to be mentally competent, and the burden is on the petitioner to prove incapacity by clear and convincing evidence." ***In re Hyman***, 811 A.2d 605, 608 (Pa. Super. 2002) (citation omitted). Our review of an orphans' court's determination in a competency case is an abuse of discretion standard, recognizing that the court had the opportunity to observe all of the witnesses. ***See id***.

should have accorded more weight to his own assessment of his capacity and ability to support himself financially. (*See id.* at 25).

**B.**

The PEF Code defines an incapacitated person as "an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety." 20 Pa.C.S. § 5501. To establish incapacity:

> . . . the petitioner must present testimony, in person or by deposition from individuals qualified by training and experience in evaluating individuals with incapacities of the type alleged by the petitioner, which establishes the nature and extent of the alleged incapacities and disabilities and the person's mental, emotional and physical condition, adaptive behavior and social skills. The petition must also present evidence regarding the services being utilized to meet essential requirements for the alleged incapacitated person's physical health and safety, to manage the person's financial resources or to develop or regain the person's abilities; evidence regarding the types of assistance required by the person and as to why no less restrictive alternatives would be appropriate; and evidence regarding the probability that the extent of the person's incapacities may significantly lessen or change.

20 Pa.C.S. § 5518.

In determining whether the appointment of a guardian is appropriate, a court must consider:

> (1) The nature of any condition or disability which impairs the individual's capacity to make and communicate decisions.

(2) The extent of the individual's capacity to make and communicate decisions.

(3) The need for guardianship services, if any, in light of such factors as the availability of family, friends and other supports to assist the individual in making decisions and in light of the existence, if any, of advance directives such as durable powers of attorney or trusts.

(4) The type of guardian, limited or plenary, of the person or estate needed based on the nature of any condition or disability and the capacity to make and communicate decisions.

(5) The duration of the guardianship.

(6) The court shall prefer limited guardianship.

20 Pa.C.S. § 5512.1(a)(1)-(6).

We also note that expert medical testimony is of great significance in an incapacity proceeding because it assists the orphans' court in determining the nature, severity and consequences of an alleged incompetent person's disability. *See In re Estate of Wood*, 533 A.2d 772, 774 (Pa. Super. 1987).

**C.**

Instantly, the orphans' court found clear and convincing evidence to adjudicate W.S. incapacitated and concluded that he is in need of a permanent plenary guardian of his estate and person. In rendering its decision, the court explained:

[Dr. Carroll's] 20-plus page expert report [] concluded in multiple locations that Appellant was a totally incapacitated person and in need of plenary guardianship[.] Appellant would have us believe, simply because he says so, that he is capable of independent living and can adequately care for himself. However, the petitioners presented clear and convincing evidence to the contrary through the testimony of two experts and the social

worker. Appellant presented no evidence to refute the factual conclusion that Drs. Carroll and Ledakis reached regarding his financial prowess, his medical problems or his living situation. Nor did this Court find credible Appellant's explanations as to the lack of food, electricity and phone in his home. The undersigned, while sympathetic to Appellant's own description of his mental and physical state and his stated desire to live independently, found the other witnesses to be far more believable.

. . . The Trial Court heard two witnesses each conclude, albeit in different words, that Appellant was a totally incapacitated individual in need of a guardian to help him with his care and decision making. . . . Both Dr. Carroll and Dr. Ledakis concluded unequivocally that Appellant was totally impaired in almost every function. Dr. Carroll diagnosed Appellant with 'major neurocognitive impairment' and Dr. Ledakis diagnosed Appellant with 'major vascular-cased cognitive disorder.' The undersigned saw no conflict in their testimony and Appellant did not present any testimony to that effect.

Two highly-experienced experts presented extensive testimony and written reports concluding that Appellant was a totally incapacitated person in need of plenary guardianship. Appellant failed to present the Trial Court with any evidence to counterbalance these other witnesses and reports. No bank or stock account or 'trading' statements, tax returns or other written evidence was provided which would have enabled us to accept as fact his claims about his earning capacity or his prior business activities or to support his statement that he expected to continue to earn income through trading, through restarting a retail business or through his anticipated purchase of a property where he would establish a new business.

. . . While Appellant was articulate and at times charming, the court found Appellant's testimony to be indicative of his impaired mental status. His claims that 'I'm not incapacitated in any way' simply did not pass muster.

. . . Having heard all the testimony and reviewed the expert reports, the undersigned concluded that Appellant's testimony was not as credible as both experts and [Ms. Kifer]. The presumption of capacity was handily overcome and clear, convincing and extensive proof of Appellant's need for appointment of a guardian of both the person and estate was

presented. The court concluded that no less restrictive alternative
to appointment of a guardian was available.

(Orphans' Court Op. at 10-13) (record citations omitted).

The record supports the orphans' court's conclusion and the credibility determinations it made against W.S. after observing the witnesses, listening to their testimony, interacting with W.S., and considering the expert reports. Both Drs. Carroll and Ledakis expressed substantial concerns regarding W.S.'s ability to receive information, process the information and make reasonable decisions about his healthcare and finances. Although they performed different tests, they concurred that W.S. suffers from dementia, is incapacitated and is in need of plenary guardianship. Despite any marginal improvement W.S. may have demonstrated, Dr. Carroll concluded there was essentially "no difference" between the three evaluations he conducted, and Dr. Ledakis explained that W.S.'s medical condition had likely caused delirium and changes to his mental status.

Ms. Kifer testified that W.S. is inclined to exercise his discretion AMA to his detriment, which has resulted in a pattern of reinjury and rehospitalization. W.S.'s lack of cooperativeness and limited financial resources have made placement with any guardian difficult, especially in light of his poor cognitive functioning and medical history, making assurance of his full-time residency in a structured setting necessary.

W.S. offered only his own personal viewpoint as to his ability to live independently and support himself financially, as he presented no

documentation or testimony to support this position. Although the orphans' court was sympathetic to W.S.'s very difficult circumstances and desire to maintain independence, the court remained mindful of its responsibility to ensure that W.S. does not continue to act against his own interests or jeopardize his eligibility to receive much needed medical benefits. In sum, the Agency presented clear and convincing evidence to adjudicate W.S. incapacitated and appoint a plenary guardian of his estate and person.

     Decree affirmed.


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 9/15/2022*